UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
In re:

                                        Chapter 7

MEILING ZOU,

                                        Case No. 20-44315-jmm

                        Debtor.
-----------------------------------------------------------------X
GUANGLEI JIAO, NAN YU, RUIJI ZHAI,
YANJUN LI, and TROY LAW PLLC,

                        Plaintiffs,         Adv. Pro. No. 21-01036-jmm

             v.

MEILING ZOU a/k/a Denise Zou,

                        Defendant.
-----------------------------------------------------------------X

## MEMORANDUM DECISION ON OBJECTIONS TO DISCHARGE AND DISCHARGEABILITY OF DEBTS

*Appearances*:

Aaron B. Schweitzer, Esq.
Troy Law, PLLC
41-25 Kissena Boulevard, Suite 110
Flushing, NY 11355

*Counsel for Plaintiffs*
*Guanglei Jiao, Nan Yu, Ruiji Zhai,*
*Yanjun Li, and Troy Law PLLC*

Alan Stein, Esq.
Law Office of Alan C. Stein, Esq.
7600 Jericho Turnpike, Suite 308
Woodbury, NY 11797

*Counsel for Defendant*
*Meiling Zou a/k/a Denise Zou*

## INTRODUCTION

This adversary proceeding is one of three related adversary proceedings.  The plaintiffs in the adversary proceedings are former restaurant employees that assert claims for unpaid wages, attorneys' fees, and other amounts due to defendants' alleged violations of the federal Fair Labor Standards Act and New York Labor Law.  The defendants owned the restaurant or are alleged to have managed the restaurant or asserted control over the restaurant's workers or their wages.

Plaintiffs seek declaratory judgement against each defendant that plaintiffs' claims are nondischargeable under Bankruptcy Code section 523(a)(6).  Additionally, plaintiffs seek declaratory judgment that their claims against defendant Zhaorui Fan are nondischargeable under Bankruptcy Code section 523(a)(2)(A).  Lastly, plaintiffs seek judgment denying Zhaorui Fan a discharge under Bankruptcy Code section 727(a)(4)(A).

For the reasons set forth below, judgment is granted in favor of plaintiffs to the extent that each plaintiff's claims against Zhaorui Fan will be declared nondischargeable under Bankruptcy Code section 523(a)(6).  Judgment is denied on plaintiffs' other claims against Zhaorui Fan. Judgment is denied regarding plaintiffs' claims against all remaining defendants.

## JURISDICTION

The Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b), 28 U.S.C. § 157(a), and the Standing Order of Reference entered by the United States District Court for the Eastern District of New York dated August 28, 1986, as amended by Order dated December 5, 2012.  The Court may hear and determine these proceedings because they are core proceedings pursuant to 28 U.S.C. § 157(b)(2)(I) and (J).  This decision constitutes the Court's

findings of fact and conclusions of law to the extent required by Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## BACKGROUND

### A.    The Bankruptcy Cases

#### i.    The Fan Bankruptcy

On December 18, 2020, Zhaorui Fan ("Fan") filed a voluntary petition for relief under chapter 7 of title 11 of the United States Code. *In re Zhaorui Fan*, Case No. 20-44317 (the "Fan Bankruptcy"), ECF No. 1.

Fan filed his Schedules and Statement of Financial Affairs ("SOFA") on December 18, 2020, and January 4, 5, and 8, 2021, and amended Schedules on, January 11 and April 20, 2021. Schedules, Fan Bankruptcy, ECF Nos. 1, 15, 18, 21, 25, 37, 48; SOFA, Fan Bankruptcy, ECF No. 23. The Schedules and SOFA are signed by Fan under penalty of perjury. *Id.* Fan's Schedules represent he has no interest in any business-related property. Schedules, Fan Bankruptcy, ECF Nos. 1, 15, 18, 25, 37, 48.

Fan's SOFA discloses Fan's interests in the following businesses:

- Shang Shang Qian Inc. ("Shang Shang Qian") (Flushing, New York). As per Fan's SOFA, Shang Shang Qian operated a Chinese restaurant that was in business from July 15, 2015 through November 2018. SOFA, Fan Bankruptcy, ECF No. 23.

- USA Lida Seafood (Garden City, New York). As per Fan's SOFA, USA Lida Seaford existed in 2018. *Id.* The nature of the business is not disclosed in the SOFA. The SOFA reports that the "business closed." *Id.*

- Black Mercury. Fan's SOFA reports that Black Mercury was "[n]ever active." *Id.*

- New DBI Trading Inc (Flushing, NY). Fan's SOFA reports that the business began operating on January 23, 2014 but does not disclose the nature of the business or whether the entity still exists. *Id.*

####     ii.        **The Wu Bankruptcy**

On December 18, 2020, Daffney Wu ("Daffney") and Yuanyuan Wu ("Andy") filed a joint

petition for relief under chapter 7 of the Bankruptcy Code.  *In re Daffney Wu and Yuanyuan Wu*,

Case No. 20-44314 (the "Wu Bankruptcy"), ECF No. 1.  Daffney and Andy filed their Schedules

and SOFA on December 18 and 21, 2020, and January 4 and February 27, 2021.  Schedules, Wu

Bankruptcy, ECF Nos. 1, 8, 21, 28; SOFA, Wu Bankruptcy, ECF No. 27.  The SOFA indicates that

Andy became a 50% owner of Shang Shang Qian in 2016.  SOFA, Wu Bankruptcy, ECF No. 27.

####     iii.        **The Zou Bankruptcy**

On December 18, 2020, Meiling Zou ("Zou" and together with Fan, Andy, and Daffney,

the "Defendants") filed a petition for relief under chapter 7 of the Bankruptcy Code, together with

her Schedules and SOFA.  *In re Meiling Zou*, Case No. 20-44315 (the "Zou Bankruptcy"),

ECF No. 1.  Zou filed amended Schedules on December 21, 2020.  Zou Bankruptcy, ECF No. 1,

7.

### B.        <u>The FLSA Action</u>

On October 9, 2018, Guanglei Jiao ("Jiao"), Nan Yu ("Yu"), Ruiji Zhai ("Zhai"), and

Yanjun Li ("Li" and together with Jiao, Yu, and Zhai, the "Plaintiffs"), together with Troy Law

PLLC ("Troy Law")[1], filed a lawsuit against Shang Shang Qian and Defendants for alleged

violations of the Fair Labor Standards Act of 1938, ("FLSA") and New York Labor Law,

("NYLL") in the United States District Court, Eastern District of New York, Case No. 18-cv-05624

(the "FLSA Action").

---

[1] Troy Law represents Plaintiffs in the FLSA Action and in the Adversary Proceedings (defined below).  Troy Law
   included itself as a plaintiff asserting Defendants would be obligated to pay Plaintiffs' legal fees if they prevail in
   the FLSA Action.

C.    **The Adversary Proceedings**

On March 29, 2021, Plaintiffs and Troy Law filed three adversary proceedings: (i) Adversary Proceeding No. 21-1035 against Daffney and Andy (the "Wu Adversary Proceeding"); (ii) Adversary Proceeding No. 21-1036 against Zou (the "Zou Adversary Proceeding"); and (iii) Adversary Proceeding No. 21-1037 against Fan (the "Fan Adversary Proceeding", and together with the Wu Adversary Proceeding and the Zou Adversary Proceeding, the "Adversary Proceedings").

The Complaints filed in each of the Adversary Proceedings allege the debts owed to Plaintiffs are excepted from discharge pursuant to (i) Bankruptcy Code section 523(a)(2)(A) because Defendants engaged in schemes to deliberately underpay Plaintiffs, failed to provide time of hire notices and paystubs, and obtained services from Plaintiffs by willfully making false representations and circumventing state and federal overtime laws, and (ii) Bankruptcy Code section 523(a)(6) because Defendants willfully and maliciously failed to pay wages, overtime, and "spread of hours" premiums, or to provide wage statements and notices in violation of the FLSA and NYLL.  Compl. ¶¶ 96–97, 101–102, Wu Adversary Proceeding, ECF No. 1; Compl. ¶¶ 96–97, 101–102, Zou Adversary Proceeding, ECF No. 1; Compl. ¶¶ 96–97, 101–102, Fan Adversary Proceeding, ECF No 1.

In the Fan Adversary Proceeding Complaint, Plaintiffs also claim Fan's discharge should be denied under Bankruptcy Code section 727(a)(4)(A), alleging Fan misrepresented in his Schedules that USA Lida Seafood is closed, and Black Mercury Corp. was never active even though New York State records list both corporations as "active."  Compl. ¶¶ 96–97, 101–102, 108–110, Fan Adversary Proceeding, ECF No 1.

###### i.    Motions to Dismiss the Adversary Proceedings

Defendants filed motions to dismiss in each of the Adversary Proceedings. Mot. to Dismiss, Wu Adversary Proceeding, ECF No. 8; Mot. to Dismiss, Zou Adversary Proceeding, ECF No. 7; Mot. to Dismiss, Fan Adversary Proceeding, ECF No 7.

The Court dismissed the Bankruptcy Code section 523(a)(2)(A) claims against all Defendants but granted Plaintiffs leave to replead. Tr. of July 6, 2021 Hr'g 14:25–15:8, 15:4–8, 15:20–16:3, Wu Adversary Proceeding, ECF No. 15. The Court dismissed the Bankruptcy Code section 727(a)(4)(A) claim against Fan but granted Plaintiffs leave to replead. *Id.* 14:25–15:8, 15:20–16:3.

Plaintiffs did not file amended complaints in the Wu Adversary Proceeding or the Zou Adversary Proceeding. Therefore, the only claims against Zou, Daffney, and Andy are the objections to dischargeability of Plaintiffs' claims under Bankruptcy Code section 523(a)(6).

###### ii.    Amended Complaint and Claims Against Fan

On August 6, 2021, Plaintiffs filed an amended complaint ("Amended Complaint") in the Fan Adversary Proceeding that reiterated their Bankruptcy Code section 523(a)(6) claim and expanded the allegations concerning their Bankruptcy Code sections 523(a)(2)(A) and 727(a)(4)(A) claims. Am. Compl., Fan Adversary Proceeding, ECF No. 15.

###### a.    Non–Dischargeability of Plaintiffs' Claims Pursuant to 11 U.S.C. § 523(a)(2)(A) for False Pretenses, a False Representation, or Actual Fraud

Plaintiffs claim the debts owed to them by Fan are nondischargeable pursuant to Bankruptcy Code section 523(a)(2)(A) because Fan obtained services from Plaintiffs by false pretenses, a false representation, and actual fraud. Am. Compl. ¶ 106, Fan Adversary Proceeding, ECF No. 15. Plaintiffs allege Fan promised all Plaintiffs at the beginning of their employment at Shang Shang Qian that they would receive a pay raise after the first month, yet Fan had no intention

of fulfilling that promise.  *Id.* ¶ 97.  Plaintiffs claim Fan never provided those raises and they "faithfully relied upon Fan's words to fulfill his promises until the end of their employment."  *Id.*

Plaintiffs claim they justifiably relied on Fan's misrepresentations and omissions and were damaged as a proximate result because they were deprived of the wages to which they were entitled under federal and state law.  *Id.* ¶ 105.  Plaintiffs claim, "an employer is tasked with accounting for hours, and despite knowing the number of hours Plaintiffs worked each week for the Defendant's [*sic*] and Plaintiffs having no knowledge of the legally required wages to be compensated and the circumstances of the employment left Plaintiffs dependent upon [Fan] for a true and correct accounting of hours and calculation of pay."  *Id.*

### b.  Non–Dischargeability of Fan's Debts Pursuant to 11 U.S.C. § 727(a)(4)(A) For False Oath or Account

Plaintiffs claim Fan is not entitled to a discharge pursuant to Bankruptcy Code section 727(a)(4)(A) because he knowingly and fraudulently omitted material information from his Schedules and SOFA.  Am. Compl. ¶ 127, Fan Adversary Proceeding, ECF No. 15.

Plaintiffs allege Fan failed to disclose the following in his Schedules and SOFA: (i) his association with Yuansheng Trading Inc.; (ii) his continued employment with Shang Shang Qian, which is doing business under the name "Chu Lai Zha Dao"; (iii) his current ownership, management, and daily operation of the Chu Lai Zha Dao restaurant; (iv) his use of the Food Service Establishment License issued to Shang Shang Qian to conduct business as Chu Lai Zha Dao restaurant; or (v) his use of the alias "Ricky" when working at Chu Lai Zha Dao restaurant. *Id.* ¶¶ 118, 119, 121–126.

### iii.    The Trial

The Court conducted a two-day consolidated trial in the Adversary Proceedings on March 28, 2023 and March 29, 2023 ("Trial").  Tr. of March 28, 2023 Trial, Wu Adversary Proceeding,

ECF No. 33 ("Trial Tr. 1"); Tr. of March 29, 2023 Trial, Wu Adversary Proceeding, ECF No. 34

("Trial Tr. 2").

### a. Plaintiffs' Case in Chief

Plaintiffs' case in chief consisted solely of Plaintiffs' testimony, which is summarized

below.

### 1. Jiao's Testimony

<u>Allegations Concerning Employment and FLSA and NYLL Violations</u>

- Jiao worked at Shang Shang Qian from May 31, 2017 until September 21, 2018. Trial Tr. 1, 12:14–19.

- Initially, Jiao received $3,000 per month. *Id.* 19:2–10.

- Jiao was not given information about the minimum wage. *Id.* 27:5.

- Jiao did not know the minimum wage rate when he started working at Shang Shang Qian. *Id.* 27:8.

- No one at Shang Shang Qian explained to Jiao what should happen if he worked more than forty hours a week. *Id.* 27:12.

- No one at Shang Shang Qian explained to Jiao what should happen if he worked more than ten hours a day. *Id.* 27:16.

<u>Allegations Concerning Fan</u>

- Jiao was hired by Fan. *Id.* 11:10.

- Fan was the boss. *Id.* 13:2–4.

- Fan did not give Jiao onboarding paperwork when he was hired. *Id.* 29:1–6.

- Fan told Jiao his work schedule would be from 3:00 p.m. until 2:00 a.m. six days a week but Jiao usually worked seven days a week. *Id.* 14:17–24, 15:6–13, 17:16–17.

- At Fan's request, Jiao would leave no later than 2:00 p.m. to pick up supplies for Shang Shang Qian before arriving for his shift at 3:00 p.m. *Id.* 15:17–22, 16:5–19, 17:20.

- Fan told Jiao to clean and process products after his 2:00 a.m. shift. *Id.* 17:23–25. After 2:00 a.m., Jiao would stay to clean and process food. *Id.* 17:24. Jiao would work until at least 2:45-3:00 a.m. *Id.* 17:12.

- Sometime in 2018, Fan changed Jiao's schedule to 4:00 p.m. to 3:00 a.m. *Id.* 18:4–5. Jiao would then go to the supermarket at 3:00 p.m. and work past 3:00 a.m. to clean and process food. *Id.* 17:11–14, 18:4–9.

- In or around the end of 2017, Jiao complained to Fan that his workload was heavy, his salary was low, and he needed more time off. *Id.* 13:7–11, 14:15. Fan told Jiao, "I will treat you well, I will give you enough of a salary." *Id.* 13:10. In January 2018, Fan raised Jiao's salary by $200 a month. *Id.* 19:13, 20:2.

- Jiao earned $3,200 a month until the end of his employment. *Id.* 19:18.

- Fan gave Jiao a slip to sign each month reflecting days and hours worked when given his cash payments. *Id.* 28:12. Fan would take the slip after Jiao signed. *Id.* 28:12–20, 49:10–25.

- Fan told Jiao that if Jiao withdrew the FLSA Action, Fan would give Jiao money; otherwise, Fan would pay more than necessary to fight the case and Jiao would not get a single penny. *Id.* 34:4–14. Fan told Jiao that Andy said he would make sure Jiao is a "lost person" if Jiao did not stop the lawsuit. *Id.* 34:14–16. Jiao understood that to mean he would be killed. *Id.* 34:19–20. Jiao did not know the exact month or year of this conversation but recalled it took place sometime after the FLSA Action was filed but before the COVID-19 Pandemic. *Id.* 35:10–13.

- Fan told Jiao that he had a Japanese restaurant upstate, a restaurant with Andy in North Carolina, and a Japanese merchandising company in Flushing. *Id.* 29:17–20.

- Jiao did not know if any of those businesses were still operating. *Id.* 29:23.

- Shang Shang Qian was "still in operations for a very, very long time" after Jiao quit and at some time, the name on the storefront changed. *Id.* 31:16–25, 32:4–6. Jiao could not recall when the name changed. *Id.* 32:2.

- After the name changed, Jiao saw Fan inside the store standing by the bar counter, although Jiao did not see whether Fan was paying as a customer or taking money for the restaurant. *Id.* 32:19–25, 33:4.

Allegations Concerning Andy

- Andy came to Shang Shang Qian at least three times a week. *Id.* 21:11.

- When Andy was in the restaurant, he would treat his friends and sometimes talk to the employees regarding operations (i.e., dishes and the menu) or about what the store needs and what must be purchased.  *Id.* 21:23–22:8.

Allegations Concerning Daffney

- Daffney worked in the restaurant.  *Id.* 22:19.

- Jiao saw Daffney interview new waitstaff, arrange for supplies to be provided to kitchen workers, and tell kitchen workers to clean.  *Id.* 23:16–20.  There was a period when Daffney was at the restaurant every day during the store's operations.  *Id.* 38:1–12.

- Jiao was paid in cash by Fan, or sometimes Daffney.  *Id.* 27:19–28:4.

Allegations Concerning Zou

- Zou was in charge of calculating employee salaries and would direct work in the store.  *Id.* 24:16–17.  Zou would offer advice on how things should be arranged or how to improve the taste of a dish.  *Id.* 41:13–18.

- When Jiao worked seven days a week, as opposed to six, Zou divided his monthly salary (either $3,000 or $3,200) by 30 and paid Jiao for one extra day.  *Id.* 26:1–11.

- Jiao saw Zou's car parked in front of the restaurant sometime after Shang Shang Qian's name changed.  *Id.* 32:11–12.

## 2.  Li's Testimony

General Allegations Concerning Employment and FLSA and NYLL Violations

- Li worked as a waitress at Shang Shang Qian from June or August 2016 until September 21, 2018.  Trial Tr. 1, 62:1–11, 65:5–23.

- Li was told she would be paid $8.00 an hour with no tips.  *Id.* 64:7, 64:17.

- Li never saw minimum wage notices at Shang Shang Qian.  *Id.* 74:8.

- Before working at Shang Shang Qian, Li did not understand what the minimum wage was.  *Id.* 74:11.

- No one at Shang Shang Qian told Li that she was being paid less than minimum wage or that customer tips should make up the difference between her hourly rate and the minimum wage.  *Id.* 72:10.

- From June 9, 2016 until July 31, 2016, Li worked from 2:00 p.m. until 2:00 a.m.  *Id.* 70:2–3.

- From June 2016 until around January 2018, Li worked from 3:00 p.m. until 2:00 a.m.  *Id.* 70:3–5.

- From February 2018 through September 21, 2018, Li worked from 4:00 p.m. until 3:00 a.m.  *Id.* 70:5–7.

- Li worked one-to-two hours of overtime after her shift ended to clean, calculate daily revenue, or help in the kitchen.  *Id.* 70:7–16.

- From June 2016 until July 2016, Li worked five days a week.  *Id.* 71:1.

- From August 2016 until September 2018, Li worked seven days a week.  *Id.* 71:4–7.

- Li was paid her hourly rate for every extra hour worked over ten hours.  *Id.* 73:21–22.

- No one from Shang Shang Qian explained to Li what should happen with her wages if she worked more than ten hours a day.  *Id.* 74:19.

- Shang Shang Qian's daily revenue generally ranged from $2,000 to $5,000.  *Id.* 66:9.

<u>Allegations Concerning Fan, Andy, and Daffney</u>

- Fan and Andy interviewed and hired Li.  *Id.* 62:18–20.

- Fan and Andy asked Li to work seven days a week, but Li told them she could only do five days a week.  *Id.* 63:23–25.  Fan and Andy agreed at the time.  *Id.* 64:4.

- Fan made the final decision on who to hire.  *Id.* 69:18–19.

- Fan calculated Li's pay and distributed her salary.  *Id.* 74:5, 74:21.

- From January 2017 to July 2018, Li was paid $9.00 an hour.  *Id.* 71:13–22.

- From August 1, 2018 until September 21, 2018, Fan only paid Li tips and no longer paid her a salary.  *Id.* 71:15–16.

- Fan assigned additional duties to Li such as cleaning, assisting in the kitchen, and calculating daily sales.  *Id.* 65:12–15.

- After Li calculated the daily revenue, she would send a photograph of the calculations to Fan and Andy in "We Chat".  *Id.* 67:4–23.  Li, Fan, and Andy were the only three in the "We Chat" chatroom.  *Id.* 67:12.

- Li would give the daily cash to either "boss" Fan, "boss" Andy or Daffney. *Id.* 67:21–68:8.

- Fan asked Li and Yu to track employee hours. *Id.* 84:20–85:2. Every employee (including Li, Jiao, Zhai and Yu) had a sheet on which Li would record their hours. *Id.* 86:20–87:13. Li would give those sheets to Fan. *Id.* 88:10.

- Li wrote checks on behalf of Shang Shang Qian at Fan's request but never put her name or signature on the bank account. *Id.* 82:9–12, 89:17–24.

- In February 2019, Fan came to Li's new job. *Id.* 80:2–16. Fan said that he and Andy could arrange for her to work at another restaurant. *Id.* 80:20–23. Li does not know the restaurant to which Fan was referring. *Id.* 80:23–81:9. Fan also brought up the FLSA Action and told Li that they would not be successful. *Id.* 80:19. Fan told Li that if the FLSA Action did not stop, some news would break about a "murder case" in Flushing. *Id.* 81:1–2.

- Li heard Fan mention owning a Japanese restaurant upstate, a Chinese restaurant in North Carolina, and some type of seafood wholesale business. *Id.* 79:14–17.

- Li did not know whether any of those other businesses still operate. *Id.* 79:24.

Allegations Concerning Zou

- Zou would come to the restaurant to see if it was busy. *Id.* 68:15–16. If the front was dirty, she would request that it be cleaned. *Id.* 15–24. Zou also helped arrange skewers. *Id.* 68:18–24

- Li observed Zou interview other employees, some of whom were called in to audition for the job. *Id.* 69:2–9.

### 3. Zhai's Testimony

General Allegations Concerning Employment and FLSA and NYLL Violations

- Zhai worked at Shang Shang Qian from June of 2017 until September 21, 2018. Trial Tr. 1, 107:15–23.

- Fan told Zhai during his interview his salary would be $70.00 per day. *Id.* 108:13.

- Zhai worked beyond his scheduled hours most of the time. *Id.* 113:2–6.

- Zhai's pay increased to $80.00 per day in August of 2017 (*id.* 113:21), $85.00 per day in September 2017 (*id.* 114:11–12), $90.00 per day in October of 2017 (*id.* 114:13–14), and $95.00 per day in November of 2017 (*id.* 114:15–17).

- Zhai was paid once a month.  *Id.* 117:18.

- No one at Shang Shang Qian ever told Zhai that he should be paid time and a half when he worked more than forty hours per week.  *Id.* 115:3.

- No one at Shang Shang Qian explained the state or federal minimum wage to Zhai.  *Id.* 115:7.

- No one at Shang Shang Qian told Zhai what should happen if he left work more than ten hours after arriving.  *Id.* 115:11–15.

- Zhai did not see notices at Shang Shang Qian regarding federal or state wage and hour law.  *Id.* 115:23.

Allegations Concerning Fan

- Zhai was hired by Fan.  *Id.* 107:25.

- Zhai's work schedule was set by Fan.  *Id.* 108:5.

- Only Fan had input into Zhai's pay raises.  *Id.* 114:20.

- The employees listened to Fan's and Andy's orders.  *Id.* 110:5.

- Fan told Zhai the work schedule was from 3:00 p.m. until 2:00 a.m. and Zhai was expected to work seven days per week.  *Id.* 111:18–24.

- In 2018, Zhai worked at Shang Shang Qian from 4:00 p.m. until 3:00 a.m., seven days a week.  *Id.* 112:2–3.

- Fan told Zhai and Yu to wash dishes and prepare goods after working hours.  *Id.* 113:9–14.

- Fan asked Zhai and Yu to be witnesses and "indicate that there is no such matter as overtime."  *Id.* 122:23–25.  If they agreed, Fan said he would pay them.  *Id.* 123:2–3.

- Fan told Zhai that when this case is over, he would make sure Jiao disappeared and Li would be in jail.  *Id.* 123:22–23.

Allegations Concerning Andy and Daffney

- When Zhai ran out of money, he would ask Fan for an advance on his salary but once Zhai asked Andy for an advance.  *Id.* 117:21–24, 118:4.  Andy told Zhai to ask Daffney for the advance and Daffney gave Zhai the advance payment from her purse.  *Id.* 118:4–24.

- At Shang Shang Qian, Andy would do "what a boss supposedly does" such as managing personnel in the restaurant and directing employees. *Id.* 119:5–15.

- Daffney calculated orders for customers in the restaurant and also instructed Li to clean. *Id.* 120:21–121:3.

- Shang Shang Qian stopped operating after Plaintiffs quit. *Id.* 121:22. Fan told Zhai that Shang Shang Qian closed to be remodeled, and then it would be in operation again. *Id.* 122:24–25. At that time, the restaurant changed its name. *Id.* 121:24–122:1.

- In October 2021, Zhai saw Fan. *Id.* 122:10. Fan asked Zhai and Yu to be witnesses and if they agreed, they could go to other locations outside New York to open up a small shop. *Id.* 122:22–123:19. Zhai was unsure of the location to which Fan referred. *Id.* 123:21.

- Fan had a food wholesale company in New York, a Japanese restaurant upstate, and a restaurant in North Carolina with Andy. *Id.* 124:11–14.

- Zhai went to Fan's seafood wholesale company but could not recall the specific address other than it was in College Point. *Id.* 124:22–25. The seafood wholesale company is no longer operating and has not been operating for a very long time. *Id.* 125:2–5.

- Zhai does not know whether Fan's restaurants in upstate New York or North Carolina still operate. *Id.* 125:8.

Allegations Concerning Zou

- Zhai saw Zou help in the restaurant by taking dishes to tables and ringing up orders. *Id.* 120:3–8.

- Zhai observed Zou giving other employees tasks or instructions concerning the front area but was unsure what those specific instructions were. *Id.* 120:11–14.

### 4. Yu's Testimony

General Allegations Concerning Employment and FLSA and NYLL Violations

- Yu worked at Shang Shang Qian from September 8, 2016 until September 21, 2018. Trial Tr. 2, 7:8–10.

- Prior to working at Shang Shang Qian, Yu did not know the federal or state minimum wage. *Id.* 19:9.

- No one at Shang Shang Qian explained the minimum wage law to Yu. *Id.* 19:20.

13

- No one at Shang Shang Qian explained to Yu what should happen if Yu worked more than forty hours per week. *Id.* 19:24.

- No one at Shang Shang Qian explained to Yu what should happen if Yu worked more than ten hours per day. *Id.* 20:3.

- Yu was scheduled to work from 3:00 p.m. to 2:00 a.m. *Id.* 11:25. In February 2018, the hours changed to 4:00 p.m. until 3:00 a.m. *Id.* 12:1–12. Yu worked seven days per week. *Id.* 12:2–3.

- Before work, Yu would have to go to the supermarket to make purchases for the restaurant. *Id.* 8:24–9:1, 13:12–13.

- Typically, Yu would work after his shift ended for about a half hour to an hour, and on occasion he would stay until dawn. *Id.* 13:17–14:4.

- Yu's pay was raised to $70.00 per day about a month after being hired. *Id.* 14:24–15:14. Eventually, Yu's pay was raised to $80.00 per day and then to $90.00 per day. *Id.* 15:17–25. From March 1 to May 31, 2017, Yu's pay increased to $95.00 per day and thereafter to $100.00 per day. *Id.* 18:15–18. In October 2017, Yu's pay increased to $110.00 per day. *Id.* 18:21.

- Yu was paid monthly. *Id.* 20:8.

- Yu quit because the work was too tiring and there were no breaks. *Id.* 7:13–16.

Allegations Concerning Fan

- Yu was interviewed and hired by "boss" Fan. *Id.* 7:17–20.

- During the interview, Fan told Yu the salary was $60.00 per day and the schedule was 3:00 p.m. until 2:00 a.m. seven days a week. *Id.* 8:1–11.

- Fan told Yu that he had to stay past his scheduled quitting time. *Id.* 14:10.

- Fan raised Yu's pay from time to time. *Id.* 18:23.

- Fan gave Yu his pay. *Id.* 20:10–12.

- Fan would reimburse Yu for merchandise and goods Yu purchased for the restaurant. *Id.* 27:16–20.

- In 2019, Fan found Yu at Yu's new job. *Id.* 36:21–23. Fan told Yu, "you should know the power of boss Andy" and explained that if it were not for Fan, Plaintiffs would have already "disappeared". *Id.* 36:22–23, 37:3–8. Yu believed that Fan meant Plaintiffs would be killed. *Id.* 37:11.

- Fan promised Yu that if the FLSA Action was dismissed, Fan could arrange some other type of work for Yu in either upstate New York or North Carolina. *Id.* 37:14–18.

- Fan told Yu he owned a seafood wholesale business in Flushing, and restaurants in upstate New York and North Carolina.  *Id.* 35:4–6.

- Yu does not think the wholesale business is still operating and stopped operating after they quit.  *Id.* 35:9–11.

- Yu was not sure whether the restaurants in either North Carolina or upstate New York were still operating.  *Id.* 35:14–18.

- After Plaintiffs quit, Shang Shang Qian was remodeled and the name was changed.  *Id.* 35:21–22.

Allegations Concerning Andy and Daffney

- Yu saw Andy in the restaurant basically every day or every other day.  *Id.* 25:4.

- Andy directed some of the work, such as coming up with menu items.  *Id.* 25:8.

- Daffney also directed some of the work, such as telling workers to clean.  *Id.* 26:18–23.

- Occasionally, Daffney would give Yu his pay.  *Id.* 20:11–12.

- Daffney would take Yu to the supermarket in the early morning hours after work to purchase merchandise and goods for the restaurant.  *Id.* 27:2–11.

Allegations Concerning Zou

- Zou directed employees that worked in the front of the restaurant.  *Id.* 30:1–2.

**b.  Defendants' Evidence at Trial**

Defendants Zou and Daffney testified but Defendants Fan and Andy did not.  Defendants obtained admission of one exhibit consisting of 73 checks.  Trial Tr. 1, 88:11–94:9.

Zou testified she only worked for Shang Shang Qian in 2019 after Plaintiffs quit.  Trial Tr. 2, 66:9–14.  She worked part–time as a server.  *Id.* 73:22, 77:20.  Prior to her employment with Shang Shang Qian, Zou worked as a kindergarten teacher and performed sales in a real estate

company.  *Id.* 73:25–74:1.  She testified that prior to working at Shang Shang Qian, she occasionally visited the restaurant to eat with friends.  *Id.* 68:18–69:17.

Zou testified she was never an owner, officer, shareholder, or director of Shang Shang Qian. *Id.* 65:18–66:5.  Zou testified she did not have the ability to hire or fire employees, interview potential hires, supervise employees, control employees' work conditions or work schedules, determine employees' method or rate of pay, calculate monthly pay, or maintain employment records for employees.  *Id.* 66:15–67:10, 72:7, 74:2–7.  Zou denied Plaintiffs' testimony that she instructed employees to clean or otherwise told employees what to do.  *Id.* 68:1–4.  Zou also testified she did not recall ever seeing timesheets from employees at Shang Shang Qian.  *Id.* 70:10. Zou testified she did not have a role in calculating employees' pay.  *Id.* 72:7.

Daffney testified she worked part–time as a waitress at Shang Shang Qian from 2016 to 2018.  *Id.* 79:12–16.  Daffney added she would come into work when the restaurant was busy at the request of her manager, Li.  *Id.* 79:18–19, 85:5.  Daffney testified that Fan was the boss of Shang Shang Qian.  *Id.* 93:25.

Daffney testified she was not an owner, shareholder, officer, or director of Shang Shang Qian. *Id.* 79:21–80:2.  Daffney testified she did not hire or fire anyone at Shang Shang Qian, conduct interviews for prospective employees, supervise anyone at the restaurant, control work schedules, determine rate or method of pay for employees, maintain employment records, or take employees to the supermarket to purchase supplies for the restaurant.  *Id.* 80:3–81:4, 88:4, 95:21. Daffney testified that employees did not ask her for days off, she did not ask employees to clean the restaurant, and she never gave an employee an advance on salary or money for any reason.  *Id.* 88:13–19.

Daffney testified she knew the minimum wage in 2016 was $9.00 to $10.00.  *Id.* 89:1–2. Daffney testified she did not know what should happen if an employee worked more than ten hours per day, although she admitted there was a notice posted in Shang Shang Qian about the federal or state wage and hour law, which she believed was obtained by either Li or Fan and was located on the wall behind the cash register.  *Id.* 92:23–93:5, 93:11-12, 93:25.  Daffney added that the notice was written in English but could not recall whether it was also in Chinese.  *Id.* 93:7–9.  Daffney testified she did not recall whether that notice changed yearly.  *Id.* 93:15.  Daffney testified that in 2016, her rate of pay was between $9.00 and $10.00, and that she received a $1.00 per hour raise every year.  *Id.* 94:5–16.  Daffney added she did not receive tips because the tips were taken by the full–time employees.  *Id*. 94:21–22.

### D.    Post–Trial Submissions

Plaintiffs and Defendants filed post-trial briefs in each of the Adversary Proceedings.  Pls. Br., Wu Adversary Proceeding, ECF Nos. 35; Defs. Br., Wu Adversary Proceeding, 36; Pls. Br., Zou Adversary Proceeding, ECF Nos. 32, Defs. Br., Zou Adversary Proceeding, ECF No. 33; Pls. Br., Fan Adversary Proceeding, ECF No. 36; Defs. Br., Fan Adversary Proceeding, ECF No. 37. Plaintiffs also filed reply briefs.  Pls. Reply Br., Wu Adversary Proceeding, ECF No. 37; Pls. Reply Br., Zou Adversary Proceeding, ECF No. 34; Pls. Reply Br., Fan Adversary Proceeding, ECF No. 38.

### BURDEN OF PROOF

Plaintiffs bear the burden of proof on an objection to discharge.  FED. R. BANKR. P. 4005. Similarly, Plaintiffs bear the burden of proof on objections to dischargeability of a claim.  *Ball v. A.O. Smith Corp.*, 451 F.3d 66, 69 (2d Cir. 2006); *Yash Raj Films (USA), Inc. v. Akhtar (In re Akhtar)*, 368 B.R. 120, 127 (Bankr. E.D.N.Y. 2007); *First Am. Bank of New York v. Bodenstein (In*

*re Bodenstein)*, 168 B.R. 23, 28 (Bankr. E.D.N.Y. 1994).    Objections to discharge and dischargeability of a claim must be established by a preponderance of the evidence.  *Grogan v. Garner*, 498 U.S. 279, 287–88 (1991); *Ball*, 451 F.3d at 69; *Miner v. Mines (In re Mines)*, 630 B.R. 107, 112 (Bankr. E.D.N.Y. 2021); *Pergament v. Gonzalez (In re Gonzalez)*, 553 B.R. 467, 473 (Bankr. E.D.N.Y. 2016); *In re Akhtar*, 368 B.R. at 127; *In re Bodenstein*, 168 B.R. at 28.

"Once sufficient evidence is presented by the plaintiff to satisfy the burden of going forward with the evidence, the burden shifts to the debtor to provide evidence to rebut the plaintiff's prima facie case." *Dubrowsky v. Estate of Arnold Perlbinder (In re Dubrowsky)*, 244 B.R. 560, 572 (E.D.N.Y. 2000); *see also In re Bodenstein*, 168 B.R. at 28.

## I.    PLAINTIFFS' SECTION 523(a)(6) CLAIM

### A.  11 U.S.C. § 523(a)(6) Overview of Legal Standards

"A discharge . . . does not discharge an individual debtor from any debt . . . for willful and malicious injury by the debtor to another entity or to the property of another entity[.]"  11 U.S.C. § 523(a)(6).  To prevail on a claim under Bankruptcy Code section 523(a)(6), a plaintiff must prove by a preponderance of evidence that the (1) debtor acted willfully, (2) debtor acted maliciously, and (3) debtor's willful and malicious actions caused injury to the plaintiff or the plaintiff's property.  *Wu v. Lin (In re Qiao Lin)*, 576 B.R. 32, 41 (Bankr. E.D.N.Y. 2017); *Guggenheim Cap., LLC v. Birnbaum (In re Birnbaum)*, 513 B.R. 788, 802–03 (Bankr. E.D.N.Y. 2014).

The Bankruptcy Code does not define the term "willful."  The Supreme Court has defined "willful" to mean "deliberate or intentional."  *In re Birnbaum*, 513 B.R. at 803 (citing *Kawaauhau v. Geiger*, 523 U.S. 57, 61 n.3 (1998)).  A showing of willfulness for purposes of Bankruptcy Code section 523(a)(6) requires a showing that "the actor intend[ed] 'the consequences of an act,' not simply 'the act itself.'"  *Id.*; *see also In re Qiao Lin*, 576 B.R. at 54 (willfulness under section 523(a)(6) requires proof of "a deliberate or intentional *injury*, not merely a deliberate or intentional

*act* that leads to injury") (emphasis in original); *Curtis v. Ferrandina (In re Ferrandina)*, 533 B.R. 11, 26 (Bankr. E.D.N.Y. 2015) ("Courts within the Second Circuit have found that if a debtor believes that an injury is substantially certain to result from his conduct, the debtor will be found to have possessed the requisite intent to injure[.]") (collecting cases).  Reckless or negligent conduct is not sufficient to satisfy section 523(a)(6)'s "willful" requirement.  *In re Ferrandina*, 533 B.R. at 26.

The Bankruptcy Code does not define "malicious."  The Second Circuit Court of Appeals has defined "malicious" to mean "wrongful and without just cause, even in the absence of personal hatred, spite, or ill-will."  *Id.* at 26 (citing *Navistar Fin. Corp. v. Stelluti (In re Stelluti)*, 94 F.3d 84, 87 (2d Cir. 1996)).  "Malice may be constructive or implied."  *In re Stelluti*, 94 F.3d at 87 (citations omitted).  "Actual malice is present where there is 'a wrongful act done consciously and knowingly in the absence of just cause or excuse.'"  *Moreno v. Orly*, No. 15-11650(JLG), Adv. No. 16-01020(JLG), 2016 WL 4376947, at *6 (Bankr. S.D.N.Y. Aug. 10, 2016) (quoting *Nesler v. Thomason (In re Thomason)*, 288 B.R. 812, 815 (Bankr. S.D. Ill. 2002)).  Malice may be implied by the acts and conduct of the accused or "when anyone of reasonable intelligence knows that the act in question is contrary to commonly accepted duties in the ordinary relationships among people, and injurious to another."  *In re Ferrandina*, 533 B.R. at 26 (citations omitted).  When determining whether there is malice, bankruptcy courts look to the totality of the circumstances.  *Rescuecom Corp. v. Khafaga (In re Khafaga)*, 419 B.R. 539, 550 (Bankr. E.D.N.Y. 2009).

### B.  Application of Standards

Defendants offered no testimony or evidence to refute that Plaintiffs were not paid the minimum wage, overtime, or spread of hours wages.  Defendants only dispute whether Plaintiffs' injuries resulted from Defendants' willful or malicious conduct.

Plaintiffs assert each Defendant acted willfully because each intended for Plaintiffs not to be paid the minimum wage, overtime, or spread of hours wages and each Defendant exercised control and caused each Plaintiff to work hours far in excess of that permitted under the FLSA and NYLL. Pls. Br. 11–12. Defendants argue Plaintiffs' injuries were not willful because "there was no testimony or other evidence presented by Plaintiffs at trial that [Defendants] had the means to pay Plaintiffs their lawful wages in accordance with FLSA and NYLL but simply chose not to; thus, Plaintiffs failed to prove at trial that the alleged violations of the FSLA and NYLL were without just cause or excuse." Defs. Br. 17. Defendants also argue there was no testimony that Daffney or Zou were owners, shareholders, officers or directors of Shang Shang Qian. *Id.*

Plaintiffs allege they proved "actual malice at least on the part of Fan and [Andy], who threatened them with kidnapping or death in retaliation for filing [the FLSA action], and as inducement to withdraw, a lawsuit for recovery of their unpaid wages." Pls. Br. 14. Defendants claim Plaintiffs introduced no evidence of malicious conduct by anyone but Fan. Defs. Br. 18. Also, Defendants argue the malicious acts complained of allegedly occurred months after Plaintiffs quit, therefore, "whatever was said in 2019 or sometime after the District Court action was filed or in 2021, has absolutely nothing to do with the element of malice for non–dischargeability because it's unrelated in time and not related to the injury." *Id.*

### i.    Fan Acted Willfully and Maliciously

Plaintiffs' testimony established that Fan owned and controlled Shang Shang Qian and controlled the terms of each Plaintiff's employment, including rate of pay and hours worked. In that regard, Plaintiffs testified that Fan was responsible for interviewing and hiring employees at Shang Shang Qian (Trial Tr. 1, 11:10, 62:18–20, 69:18–19, 107:25; Trial Tr. 2, 7:17–20), paying employees at Shang Shang Qian (Trial Tr. 1, 27:21–28:4, 74:5, 74:21, 118:4; Trial Tr. 2, 20:10–12), setting employees' work schedules and rates of pay (Trial Tr. 1, 14:17–24, 15:6–22, 17:12–

20–18:5, 19:2–4, 19:13, 20:2, 63:3–7, 63:24–64:17, 65:15, 72:17–19, 74:5, 74:21, 108:5–17, 110:5, 111:18–24, 113:11–14, 114:20, 116:16, 118:4; Trial Tr. 2, 8:1–11, 14:10, 18:23,20:10–12), and keeping track of each Plaintiff's hours worked by having them sign timesheets monthly (Trial Tr. 1, 49:10–25, 86:20–87:13, 117:10–16; Trial Tr. 2, 22:10).

Fan contends that Plaintiffs have not established willfulness because they failed to show that Fan had the money to pay the wages and chose not to pay. Defs. Br. 17. However, Li testified Shang Shang Qian's revenue on a typical day was between $2,000 to $5,000. Trial Tr. 1, 66:9. Fan did not introduce evidence that Shang Shang Qian's revenue was insufficient to pay wages or that Fan himself was unable to pay wages as required by law.

Additionally, each Plaintiff worked at Shan Shang Qian for over a year. Trial Tr. 1, 11:6, 12:15–19 (Jiao worked at Shang Shang Qian from May 31, 2017 until September 21, 2018); *Id.* 62:1–11, 65:5–23 (Li waitressed at Shang Shang Qian from June or August 2016 until September 21, 2018); *Id.* 107:15–23 (Zhai worked at Shang Shang Qian from June of 2017 until September 21, 2018.); Trial Tr. 2, 7:8, 13–16 (Yu worked at Shang Shang Qian from September 8, 2016 to September 21, 2018). Fan does not dispute that Plaintiffs never received minimum wage, overtime, or spread of hours pay. Assuming Fan lacked the ability to pay lawful wages, employing workers for over a year without the ability to pay lawful wages is evidence of willfulness.

Respecting the element of malice, Fan argues only that threats of violence after Plaintiffs' employment was terminated does not establish malice. Defs. Br. 18. The Court may infer malice when "anyone of reasonable intelligence knows that the act in question is contrary to commonly accepted duties in the ordinary relationships among people, and injurious to another." *In re Ferrandina*, 533 B.R. at 26 (citation omitted).

Plaintiffs' testimony established that Fan (i) scheduled his employees to work no less than 11 hour shifts for six or seven days a week without paying the minimum wage or overtime (Trial Tr. 1, 14:20–24, 15:6–13, 17:12–24, 18:4–5, 70:2–16, 71:1–7, 111:18–24, 112:2–3, 113:2–6, 122:22–23; Trial Tr. 2, 11:25, 12:1–12, 13:21–14:4), and (ii) Fan did not provide his employees with pay stubs or minimum wage notices (Trial Tr. 1, 27:5, 29:1, 74:8, 115:23; Trial Tr. 2, 19:20). The testimony is unrefuted.  Putting threats of violence aside, the Court finds that Fan acted with malice because, taken as a whole, the evidence establishes that Fan's acts are contrary to commonly accepted duties of an employer and injurious to employees.  *Cf.  Petralia v. Jercich (In re Jercich)*, 238 F.3d 1202, 1207 (9th Cir. 2001) (finding prompt payment of wages due is a fundamental public policy and bad faith failure to pay wages is tortious). [2]

Plaintiffs' testimony that Fan threatened them is unrefuted and is additional evidence of malice, notwithstanding the threats were made after Plaintiffs quit their jobs.

### ii.    Plaintiffs Failed to Prove Andy Acted Willfully and Maliciously

Plaintiffs testified that Andy would frequent the restaurant and tell employees what to do, manage personnel, and was sometimes involved in the interviewing and hiring process.  Trial Tr. 1, 21:11–22:8, 62:18–20, 63:23–64:17, 119:9–15; Trial Tr. 2, 25:4–8.  Some Plaintiffs referred to Andy as a "boss".  Trial Tr. 1, 67:21, 110:5; Trial Tr. 2, 37:3–8.  Zhai testified he would see Andy at Shang Shang Qian doing "what a boss supposedly does," such as managing the personnel by telling employees what to do.  Trial Tr. 1, 119:5–13.  Furthermore, Andy is a 50% owner of Shang Shang Qian.  SOFA, Wu Bankruptcy, ECF No. 27.  As a 50% owner of Shang Shang Qian, Andy could be liable for Plaintiffs' wages.  *See* N.Y. Bus. Corp. Law § 630 (McKinneys 2016).

---

[2] The facts in this case are somewhat unique because Fan offered no testimony or evidence explaining his failure to comply with the federal or state employment law.  Accordingly, this opinion should not be read as a pronouncement that a debtor's failure to comply with the federal or New York state law is malicious *per se*.

However, none of the Plaintiffs testified that Andy set their schedules or wages, paid them, or had the authority to write checks. The only evidence suggesting Andy controlled Plaintiffs' wages was Zhai's and Li's testimony. Zhai testified that on one occasion, he asked Andy for an advance on his salary and Andy told Zhai to ask Daffney for the money. Trial Tr. 1, 118:4–18. Li testified that after she determined the daily total revenue for Shang Shang Qian, she would send a photograph of the calculations to both Fan and Andy in "We Chat". *Id.* 66:18–67:67:9. That testimony is insufficient to establish that Andy willfully and maliciously failed to pay Plaintiffs wages because the testimony fails to establish Andy was responsible for, or authorized to, pay wages, or authorized to use Shang Shang Qian's cash, bank accounts, or other assets.

### iii.    Plaintiffs Failed to Prove Daffney Acted Willfully and Maliciously

Plaintiffs testified that Daffney interviewed potential new hires, arranged supplies for kitchen workers, asked workers to clean, drove employees to the supermarket to purchase products for Shang Shang Qian, was frequently at the restaurant, and occasionally distributed pay. Trial Tr. 1, 23:16–20, 38:1–25, 118:4–24, 120:21–121:6; Trial Tr. 2, 20:11–12, 26:18–23, 27:2–11. Daffney testified she was never an owner, shareholder, officer or director of Shang Shang Qian (Trial Tr. 2, 79:20–80:2) and she did not (i) hire or fire anyone at Shang Shang Qian, (ii) conduct interviews for potential hires at Shang Shang Qian, (iii) supervise anyone at Shang Shang Qian, (iv) control the work conditions of other employees at Shang Shang Qian, or (iv) maintain employment records. *Id.* 80:3–81:1. Daffney testified she was not responsible for determining the rate or method of pay to employees at Shang Shang Qian. *Id.* 80:15–23. Daffney denied giving employees their paychecks, salary advances, or money for any reason. *Id.* 88:13–19.

The testimony is conflicting and all witnesses appeared credible. However, the burden of proof is on Plaintiffs to prove by a preponderance of the evidence that Daffney was in a position

to exercise control over the payment of wages (or other employment terms) and willfully and maliciously failed to do so.  Plaintiffs failed to do so.

### iv.    Plaintiffs failed to Prove Zou Acted Willfully and Maliciously

Plaintiffs testified that Zou calculated employees' salary, directed workers to clean or do other tasks, and sometimes interviewed employees.  Trial Tr. 1, 24:16–17, 26:1–17, 41:13–18, 68:15–24, 69:2–9; Trial Tr. 2, 30:1–2.

Plaintiffs offered no evidence that Zou did anything more than calculate the wages.  Zou denies she calculated wages and asserts she had no control over the method or rate of pay.  Trial Tr. 2, 66:15–67:10, 72:7, 74:2–7.  Therefore, Plaintiffs have failed to prove by a preponderance of the evidence that Plaintiffs' claims result from Zou's willful conduct.

## II.    PLAINTIFFS' SECTION 523(a)(2)(A) CLAIM

### A.  11 U.S.C. § 523(a)(2)(A) Overview of Legal Standards

"A discharge . . . does not discharge an individual debtor from any debt . . . for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by. . . false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]"  11 U.S.C. § 523(a)(2)(A).

False pretenses are "implied misrepresentations intended to create and foster a false impression." *Ardizzone v. Scialdone* (*In re Scialdone*), 533 B.R. 53, 59 (Bankr. S.D.N.Y. 2015). To establish false pretenses, a plaintiff must show "(1) an implied misrepresentation or conduct by the defendants; (2) promoted knowingly and willingly by the defendants; (3) creating a contrived and misleading understanding of the transaction on the part of the plaintiffs; (4) which wrongfully induced the plaintiffs to advance money, property, or credit to the defendant." *Wang v. Guo (In re Guo)*, 548 B.R. 396, 401 (Bankr. E.D.N.Y. 2016) (citation omitted).

False pretenses can consist of either "conscious deceptive or misleading conduct calculated to obtain, or deprive, another of property, … or an implied misrepresentation or conduct intended to create a false impression." *Xin v. Zhu (In re Zhu)*, No. 19-11870-JLG, Adv. No. 19-01358-JLG, 2022 WL 3364579, at *18 (Bankr. S.D.N.Y. Aug. 12, 2022) (citations omitted).

To establish a false representation, a plaintiff must show "(1) defendant made a false or misleading statement; (2) with intent to deceive; (3) in order for the plaintiff to turn over money or property to the defendant." *In re Guo*, 548 B.R. at 401. "False representations" refer to express statements, either oral or written, which are false, misleading and designed to deceive. *In re Zhu*, 2022 WL 3364579, at *17. A plaintiff must also establish that reliance on the defendant's purported false representation was justifiable. *Id.*

To establish actual fraud, a plaintiff must show "(1) that the defendant made a false representation, (2) the defendant knew it was false at the time [it] was made, (3) that the defendant made the representation with the intention of deceiving the plaintiff, (4) that the plaintiff justifiably relied on the representation, and (5) the plaintiff sustained damages that were proximately caused by the false material representation." *In re Guo*, 548 B.R. at 401.

"[C]entral to the concept of fraud is the existence of scienter which, for purposes of § 523(a)(2)(A), requires that it be shown that at the time the debt was incurred, there existed no intent on the part of the debtor to repay the obligation." *Signature Bank v. Banayan (In re Banayan)*, 468 B.R. 542, 576 (Bankr. N.D.N.Y. 2012). "Proof of intent to deceive is measured by the debtor's subjective intention at the time the representation was made." *Id.*

### B. **Application of Standards**

This Court dismissed Plaintiffs' claims under Bankruptcy Code section 523(a)(2)(A) against all Defendants, except Fan. Tr. of July 6, 2021 Hr'g 14:25–15:8, 15:4–8, 15:20–16:3, Wu Adversary Proceeding, ECF No. 15. Plaintiffs did not brief their Bankruptcy Code section

523(a)(2)(A) claim against Fan in their Post–Trial Brief.  This Court could find that Plaintiffs waived their Bankruptcy Code section 523(a)(2)(A) against Fan by failing to address the claim. *The McFeely Ltd. P'ship v. Dilworth (In re Dilworth)*, No. 18-31552 (AMN), Adv. No. 18-03034 (AMN), 2022 WL 987044, at *25 (Bankr. D. Conn. Mar. 31, 2022).  Nonetheless, Defendants addressed this claim in their Post–Trial Brief.  Defs. Br. 10–15.  Accordingly, the Court will address the cause of action.

There is little support in the record that Fan made a misrepresentation to any of the Plaintiffs.  Based on Plaintiffs' testimony, Fan told Plaintiffs that they would work long hours, six or seven days a week for little pay.  Trial Tr. 1, 19:2–18, 64:7–17, 71:13–16, 113:17–114:17; Trial Tr. 2, 8:1–2, 14:24–18:18–23.  Nothing about those representations is false.  Plaintiffs testified that Fan promised to give raises but Plaintiffs also testified Fan gave raises.  Trial Tr. 1, 19:13, 20:2, 71:13–22, 114:5–20; Trial Tr. 2, 14:24–15:14, 15:17–25, 16:8, 18:15–21.  Plaintiffs established Fan failed to disclose that Plaintiffs were entitled to be paid minimum wage and overtime, or provide time of hire notices, and Fan had a duty to do so.  *See* Trial Tr. 1, 27:5–16, 29:1, 72:10, 74:8–11, 74:19, 115:3–23; Trial Tr. 2, 19:9, 19:24, 20:3; *see also* 29 C.F.R. § 516.4; 29 U.S.C. §§ 506, 507; NYLL § 195.  It is uncertain whether this Court could infer that Fan's disclosure failures constitute a misrepresentation for purposes of Bankruptcy Code section 523(a)(2)(A).  *In re Zhu*, 2022 WL 3364579, at **18–19 ("[T]he failure to pay overtime wages or to provide time of hire notices or paystubs are omissions that do not constitute express misrepresentations or statements.").  Moreover, Plaintiffs fail to provide citations to the record or the law to support the other elements of their Bankruptcy Code section 523(a)(2)(A) claims against Fan.  Therefore, the Court finds that Plaintiffs failed to prove by a preponderance of the evidence that their claims against Fan derive from false pretenses, false representations, or fraud.

### III.    PLAINTIFFS' SECTION 727(a)(4)(A) CLAIM

### A.  <u>11 U.S.C. § 727(a)(4)(A) Overview of Legal Standard</u>

Bankruptcy Code section 727(a)(4)(A) provides that a debtor is denied discharge when "the debtor knowingly and fraudulently, in or in connection with the case … made a false oath or account[.]"  11 U.S.C. § 727(a)(4)(A).  Denying discharge pursuant to Bankruptcy Code section 727 is "a severe sanction and must be construed strictly in favor of the debtor."  *Moreo v. Rossi (In re Moreo)*, 437 B.R. 40, 59 (E.D.N.Y. 2010).

To prevail on a claim under Bankruptcy Code section 727(a)(4)(A), a plaintiff must prove by a preponderance of evidence that "(1) the debtor made a statement under oath; (2) the statement was false; (3) the statement related materially to the bankruptcy case; (4) the debtor knew the statement was false; and (5) the debtor made the statement with fraudulent intent."  *Agai v. Antoniou* (*In re Antoniou*), 515 B.R. 9, 22 (Bankr. E.D.N.Y. 2014) (citation omitted).

Once the proponent establishes its initial burden of producing evidence of a false statement, the burden shifts to the debtor to provide a "credible explanation."  *In re Moreo*, 437 B.R. at 59; *see also In re Antoniou*, 515 B.R. at 23 ("[W]hen a plaintiff produces persuasive evidence of a false statement, the burden shifts to the debtor to come forward with evidence to prove that it was not an intentional misrepresentation or provide some other credible explanation.").  Notwithstanding, the overall burden of proof remains with the moving party.  *In re Moreo*, 437 B.R. at 59.

"Omissions as well as affirmative misstatements qualify as false statements for Section 727(a)(4)(A) purposes."  *Adler v. Ng (In re Adler)*, 395 B.R. 827, 841 (E.D.N.Y. 2008).  Even "one single false oath or account is sufficient to deny a debtor's discharge."  *TD Bank, N.A. v. Nazzaro (In re Nazzaro)*, No. 10-74869-reg, Adv. No. 10-8500-reg, 2013 WL 145627, at *7 (Bankr. E.D.N.Y. Jan. 14, 2013).  Bankruptcy schedules and statements of financial affairs require

verification by the debtor under penalty of perjury, which, by statute, has the force and effect of an oath for purposes of Bankruptcy Code section 727(a)(4)(A). *O'Connell v. DeMartino (In re DeMartino)*, 448 B.R. 122, 127–28 (Bankr. E.D.N.Y. 2011) (citing FED. R. BANKR. P. 1008, 28 U.S.C. § 1746, and *Dickinson v. Wainwright*, 626 F.2d 1184, 1186 (5th Cir. 1980)).

A statement materially relates to the bankruptcy case when it contains relevant information "that creditors and the trustee reasonably would have regarded as significant in identifying the assets of the estate that could be liquidated and used to satisfy claims[.]" *Mazer-Marino v. Levi (In re Levi)*, 581 B.R. 733, 754 (Bankr. S.D.N.Y. 2017). In that sense, the false statement or omission must bear a relationship "to the debtor's business transactions, or if it concerns the discovery of assets, business dealings, or the existence or disposition of the debtor's property." *Cap. One Equip. Fin. Corp. v. Singh (In re Singh)*, 585 B.R. 330, 340 (Bankr. E.D.N.Y. 2018) (quoting *Gordon v. Tese-Milner (In re Gordon)*, 535 B.R. 531, 538 (S.D.N.Y. 2015). "[E]ven worthless assets and unprofitable business transactions must be disclosed." *Ethelberth v. Omogun (In re Omogun)*, No. 16-75566-las, Adv. No. 17-08023-las, 2022 WL 2517160, at *10 (Bankr. E.D.N.Y. July 6, 2022) (citation omitted). "[M]ateriality does not require a showing that creditors were prejudiced by the false statement." *Id.*

The "knowledge" requirement of Bankruptcy Code section 727(a)(4)(A) is satisfied by showing that "the bankrupt knows what is true and, so knowing, willfully and intentionally swears to what is false." *In re Moreo*, 437 B.R. at 62.

Fraudulent intent can be established by a showing of actual fraud through evidence of the traditional badges of fraud, or by the debtor's reckless disregard for the truth of his statements. *In re Singh*, 585 B.R. at 338–39. Reckless disregard for the truth is analyzed by considering the following factors: (a) the serious nature of the information sought and the necessary attention to

detail and accuracy in answering; (b) a debtor's lack of financial sophistication as evidenced by his or her professional background; and (c) whether a debtor repeatedly blamed recurrent errors of carelessness or failed to take advantage of an opportunity to clarify or correct inconsistencies. *Id.* at 339 (internal quotations omitted). A failure to amend schedules can give rise to an inference of fraud, as well as series of incorrect statements and omissions of fact. *Id.*

### B. <u>Application of Standards</u>

Plaintiffs claim Fan should be denied a discharge because he failed to disclose his ownership interests in an upstate New York restaurant, a North Carolina restaurant, and a seafood wholesale business on his Schedules and SOFA. Pls. Br. 8. Additionally, Plaintiffs claim Fan failed to disclose in his Schedules or his SOFA that he continues to operate the restaurant formerly known as Shang Shang Qian. *Id.* 7. Plaintiffs contend such omissions are material and Fan intended to defraud creditors by failing to include those interests in his Schedules and SOFA, which were signed under penalty of perjury. *Id.* 10.

Yu, Zhai, Li, and Jiao each testified they heard Fan say he owned a seafood wholesale business in Flushing, and restaurants in upstate New York and North Carolina. Trial Tr. 1, 29:17–20, 79:14–17; Trial Tr. 2, 35:4–6. Yu, Zhai and Li also testified that Fan offered them employment in other restaurants. Trial Tr. 1, 79:14–17, 80:23–81:9, 122:15–123:19; Trial Tr. 2, 37:14–18. Plaintiffs want the Court to infer that Fan would not have made offers of employment if Fan had not owned an interest in those businesses. Pls. Br. 8–9.

Regarding Fan's continued ownership of Shang Shang Qian, Zhai testified that Fan told him the restaurant closed for remodeling and would be operating soon. Trial Tr. 1, 121:24–122:1. Jiao testified that after Shang Shang Qian reopened as Chu Lai Zhao Dao, he saw Fan inside standing by the bar. *Id.* 32:19–25, 33:4. Jiao also testified he saw Zou's car parked in front of the

reopened restaurant. *Id.* 32:11–12. After Jiao quit, he recalled Shang Shang Qian was "still in operations for a very, very long time" and at some time, changed its name. *Id.* 31:16–25, 32:4–6.

Plaintiffs contend that "Fan declined to testify on his own behalf at trial and did not rebut" Plaintiffs' evidence that Fan knowingly omitted his business interests from his Schedules and SOFA. Pls. Br. 9. Accordingly, "[t]he preponderance of the evidence is therefore that Fan omitted these restaurants from his petition." *Id.*

Plaintiffs rely on *In re Omogun* to support their contention that Fan was required to come forward with evidence rebutting Plaintiffs' evidence. Pls. Br. 8–10. In *Omogun*, the Court stated:

> Once the movant satisfies its initial burden of proving that a false statement was made, the burden of production shifts to the debtor to proffer a "credible explanation." *Pergament v. Smorto (In re Smorto)*, No. 07-CV-2727 (JFB), 2008 WL 699502, at *4 (E.D.N.Y. Mar. 12, 2008). If the defendant does not produce an adequate explanation, "a court may infer fraudulent intent." *United States v. Manno-DeGraw (In re Manno-DeGraw)*, Adv. Proc. No. 8-16-08006-reg, 2016 WL 3708062, at *2 (Bankr. E.D.N.Y. July 6, 2016) (citing *In re Virovlyanskiy*, 485 B.R. 268, 272 (Bankr. E.D.N.Y. 2013)).

*In re Omogun*, 2022 WL 2517160, at *9.

Here, Fan is not required to proffer a credible explanation because Plaintiffs have failed to satisfy their initial burden of coming forward with persuasive evidence that Fan made a false statement.[3] Plaintiffs offered no documentary evidence concerning Fan's ownership interests in Chu Lai Zhao Dao, the upstate New York or North Carolina restaurants, or the wholesaler. Plaintiffs could not offer the names, addresses, or other details concerning the upstate New York or North Carolina restaurants. Plaintiffs' testimony concerning Fan's ownership of the restaurants and the wholesale business was equivocal. For example, Yu, Zhai, Li, and Jiao either testified they

---

[3] The Court believed Plaintiffs when they testified that Fan told them he owned restaurants and businesses and made offers of employment to the witnesses. However, that Fan said he owned restaurants and businesses and made employment offers does not mean Fan, in fact, owned restaurants or other businesses or had the authority to offer employment.

each believed the business and restaurants might be closed or were unsure of the status of such purported operations.  Trial Tr. 1, 29:17–23 (Jiao testified he was unsure whether Fan's restaurants in upstate New York or North Carolina were still operating); *Id.* (Jiao testified he was unsure whether Fan's merchandising company in Flushing, New York still operated); *Id.* 79:14–24 (Li testified that she did not know whether Fan's restaurant in upstate New York, restaurant in North Carolina or seafood wholesale business were still operating); *Id.* 125:2–5 (Zhai testified the seafood wholesale company is no longer operating and had not been operating for a very long time.); *Id.* 125:8 (Zhai also testified that he does not know whether Fan's restaurants in upstate New York or North Carolina still operate.); Trial Tr. 2, 35:9–18 (Yu testified he thought the wholesaler stopped operating after Plaintiffs quit and was not sure if the North Carolina or upstate New York restaurants were still operating.).  Regarding Shang Shang Qian, although Jiao testified he saw Fan standing at the bar, Jiao also testified that he did not see whether Fan was paying as a customer or taking money for the restaurant.  *Id.* 32:19–25, 33:4.

As Plaintiffs failed to carry their burden of establishing that Fan omitted businesses from his Schedules or SOFA, the Court will not address the other elements of Plaintiffs' Bankruptcy Code section 727(a)(4)(A) claims.

## IV.    AWARD OF ATTORNEYS' FEES

Plaintiffs may be entitled to an award of attorneys' fees.  *See* 29 U.S.C. § 216(b); NYLL §§ 198, 663(1).  Plaintiffs, however, only requested declaratory judgment that their claims are nondischargeable.  Plaintiffs did not request this Court to fix the amounts of their claims against Fan or award money judgments.[4]  Plaintiffs introduced no evidence at Trial respecting the amounts of their claims or attorneys' fees.   Accordingly, this Court will not fix the amounts of the claims

---

[4] No proofs of claims were filed in Defendants' bankruptcy cases because the cases are "no asset cases," meaning the chapter 7 trustees in each case were unable to collect assets for distribution to creditors.

or award attorneys' fees. Instead, this Court will modify the automatic stay to permit Plaintiffs to proceed in the FLSA Action against Fan to liquidate their claims (including attorneys' fees) and to obtain and enforce any money judgment.

## **CONCLUSION**

In the Fan Adversary Proceeding:

1.  Judgment is,

    a.  granted in favor of Plaintiffs on the Second Cause of Action. Plaintiffs' claims against Fan, including any claims for attorneys' fees, are not dischargeable pursuant to Bankruptcy Code section 523(a)(6), and

    b.  denied on the First and Third Causes of Action.

2.  The automatic stay in Fan's Bankruptcy case is modified to permit Plaintiffs to proceed in the FLSA Action against Fan to liquidate their claims (including attorneys' fees) and to obtain and enforce any money judgment.

Plaintiffs are directed to submit an order and judgment within fourteen (14) days of entry of this memorandum.

In the Wu Adversary Proceeding and the Zou Adversary Proceeding, judgment is denied on Plaintiffs' Second Cause of Action, which was the only cause of action that survived Defendants' motion to dismiss. Plaintiffs' request for an award of attorneys' fees and costs is

denied.  Defendants in the Wu and Zou Adversary Proceedings are directed to submit orders and judgments within fourteen (14) days of entry of this memorandum.

Dated: January 3, 2024
      Brooklyn, New York



Jil Mazer-Marino
United States Bankruptcy Judge